IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Eric Devoy King, ) | Civil Action No. 6:13-2101-DCN-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff received SSI as a child (Tr. 17). As required by law, eligibility for these disability benefits was redetermined under the rules for determining disability in adults when the claimant attained age 18, and on January 1, 2011, it was determined that the claimant was no longer disabled as of that date. The agency also denied the plaintiff's application for child's insurance benefits based on disability, which he filed on October 1,

---

[1]    Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2]    A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

2010.  These determinations were upheld upon reconsideration after a disability hearing by a State agency disability hearing officer in February 2012 (Tr. 33-34, 45-53).  On February 2, 2012, the plaintiff requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff, his attorney, and Daniel C. Lustig, an impartial vocational expert, appeared on November 9, 2012, considered the case *de novo* and, on December 20, 2012, found that the plaintiff's disability ended on January 1, 2011, and that he had not become disabled again since that date.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on June 5, 2013.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant attained age 18 on October 20, 2010, and was eligible for supplemental security income benefits as a child for the month preceding the month in which he attained age 18.  The claimant was notified that he was found no longer disabled as of January 1, 2011, based on a redetermination of disability under the rules for adults who file new applications.

> (2)    Since January 1, 2011, the claimant has the following severe impairments: diabetes mellitus, gastritis, gastro-esophageal reflux disease, lactose intolerance, asthma, hypertension, obesity, dysmetabolic disorder, depression, learning disorder, and anxiety (20 C.F.R. § 416.920(c)).

> (3)    Since January 1, 2011, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), 416.925 and 416.926).

> (4)    After careful consideration of the entire record, I find that since January 1, 2011, claimant had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967(c) except the claimant must avoid concentrated exposure to fumes, odors, dusts, and gases.  The claimant can perform simple tasks, but no detailed or complex tasks.  He is able to work satisfactorily with coworkers and supervisors.  He can have superficial contact with the public, but should not

perform customer service, sales, or counter work. The claimant would work best in an environment that does not require him to meet production standards.

(5)    The claimant has no past relevant work (20 C.F.R. § 416.965).

(6)    The claimant was born on October 21, 1992, and is a younger individual age 18-49 (20 C.F.R. § 416.963).

(7)    The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

(8)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 416.968).

(9)    Since January 1, 2011, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. § 416.969 and 416.969(a)).

(10)    The claimant's disability ended on January 1, 2011, and the claimant has not become disabled again since that date (20 C.F.R. §§ 416.987(c) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

Individuals who are eligible for SSI benefits as children must have their eligibility for SSI redetermined at age 18 under the rules used for adults who file new applications. 42 U.S.C. § 1382c(a)(3)(H)(iii); 20 C.F.R. § 416.987(b). The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. Social Security Ruling ("SSR") 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that

prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff reached age 18 on October 20, 2010. The ALJ found that he was no longer disabled as of January 1, 2011. The plaintiff was 20 years old when the ALJ issued her decision. He completed the ninth grade and has no past relevant work (Tr. 28, 766, 776).

5

On May 22, 2000, the plaintiff underwent a consultative psychological evaluation with Gloria Gramling Smith, Ed.S., a school psychologist (Tr. 231-35). Ms. Smith administered the Stanford-Binet Intelligence Scale: Fourth Edition ("Stanford-Binet IV"). The plaintiff achieved a composite IQ score of 84, which, as Ms. Smith explained, signified that he was in the low average range of cognitive functioning (Tr. 232-33). Ms. Smith also noted that the Stanford-Binet IV test composite score was the "most reliable and best measure of overall mental ability" (Tr. 235). Ms. Smith further opined that the plaintiff appeared to have a learning disability in the area of reading recognition, or basic reading skills, reading comprehension, math reasoning, and listening comprehension (Tr. 232).

On August 23, 2000, the plaintiff underwent a consultative psychological evaluation with John Bradley, Ph.D. (Tr. 658-60). Dr. Bradley administered the Wechsler Intelligence Scale for Children-III ("WISC-III"), on which the plaintiff scored in the mild mentally retarded range of intelligence (Tr. 659). The plaintiff received a full-scale IQ score of 66, a verbal IQ score of 78, and a performance IQ score of 59 (*Id.*).

On May 15, 2007, Sara O'Neil, CFNP at Barnwell Pediatrics completed a functional capacity questionnaire regarding the plaintiff's diabetes. She noted that he had been diagnosed with diabetes in February of 2006, but she had treated him since birth. The plaintiff had Type II diabetes, was overweight, and suffered from asthma. His symptoms included general malaise, muscle weakness, abdominal pain, rapid heartbeat, dizziness, loss of balance, headaches, and hyper/hypoglycemic attacks. Emotional factors contributed to the severity of the plaintiff's symptoms and functional limitations. His symptoms and functional limitations were consistent with his impairments. The plaintiff frequently experienced symptoms that were severe enough to interfere with his attention and concentration. His impairments lasted or could be expected to last at least 12 months. He could walk two to three city blocks without rest or severe pain. Ms. O'Neil opined that the plaintiff could sit about four hours and stand/walk about 2 hours at school. His

6

impairments were likely to produce good and bad days, and he would miss about two days of school a month (Tr. 662-66).

On January 22, 2008, the plaintiff saw Malaka Johnson, M.D., and reported memory problems and worsening handwriting (Tr. 669). On February 29, 2008, the plaintiff was seen for occasional blurred vision and a headache (Tr. 670). On April 10, 2008, the plaintiff was seen for diabetes and obesity. On May 30, 2008, the plaintiff was seen for a follow up to a hospitalization for hyperglycemia (Tr. 673). On August 19, 2008, Dr. Johnson wrote that the plaintiff's diabetes was suboptimal with worsening glycemic control (Tr. 677-78). On December 1, 2008, the plaintiff was seen for obesity, increased mild hyperlipidemia, asthma, and diabetes (Tr. 681-82).

On February 6, 2009, the plaintiff's diabetes was in poor glycemic control (Tr. 290). On March 27, 2009, he had an elevated blood pressure and hyperlipidemia. On June 26, 2009, the plaintiff reported abdominal pain (Tr. 283). On September 15, 2009, the plaintiff was seen for frequent diarrhea and persistent abdominal pain. His glycemic index had worsened, and he had vitamin D insufficiency (Tr. 292).

On October 8, 2009, Ms. O'Neil indicated that the plaintiff had been diagnosed with diabetes, asthma, weight gain, dysmetabolic syndrome, hyperlipidemia, and hypertension. His symptoms included extremity pain, cough, shortness of breath, dizziness, and abdominal pain. The plaintiff's limitations in acquiring and using information were noted to be both moderate and marked. He had marked limitations in attending and completing tasks. He had moderate limitations in caring for self, moving about, and manipulating objects. His limitations in health and physical well-being were marked and extreme (the check made by Ms. O'Neil is between the two boxes) (Tr. 703-05).

On October 16, 2009, Afsar Waraich, M.D., of Palmetto Internal Medicine wrote a letter to Barnwell Pediatrics indicating that the plaintiff had a history of insulin-dependent diabetes, hypertension and persistent diarrhea with hemo-positive stool. The

7

plaintiff had abdominal discomfort for the past six months that had worsened in the past month. His symptoms were suggestive of irritable bowel syndrome and Dr. Waraich recommended a colonoscopy (Tr. 709). On October 20, 2009, a colonoscopy revealed moderate chronic inflammation with prominent lymphoid aggregates. Dr. Waraich indicated that the plaintiff's diarrhea could be secondary to irritable bowel syndrome or colitis (Tr. 710-15). On October 26, 2009, the plaintiff was seen for an abscess. He had recently been treated in the emergency room for abdominal pain and was still having that pain and bloody stools (Tr. 271).

The plaintiff reported abdominal pain and diarrhea on November 2 and 4, 2009 (Tr. 712, 714). On November 21, 2009, the plaintiff was seen at the Barnwell County Hospital emergency department for abdominal pain, nausea, vomiting, and diarrhea (Tr. 623).

On December 9, 2009, the plaintiff stated that his nausea and vomiting were no better (Tr. 713). On December 11, 2009, the plaintiff called to state that he was still vomiting every time he ate. He was advised to go to the emergency room (Tr. 714). The plaintiff returned to the emergency department on December 11, 2009, for diabetic hypergastritis and a headache (Tr. 629-31). On December 29, 2009, the plaintiff requested a second opinion for a gastrointestinal physician after experiencing continued nausea, vomiting, and diarrhea (Tr. 269).

On January 11, 2010, the plaintiff was seen by Rathna P. Amarnath, M.D., FAAP, of Palmetto Pediatric Gastroenterology and Nutrition ("PPGN"), for abdominal pain, vomiting, and nausea. The plaintiff stated that nothing helped relieve the pain (Tr. 721). On January 25, 2010, the plaintiff presented with abdominal pain, vomiting, and a history of diarrhea. He had been diagnosed with irritable bowel syndrome, but was still experiencing nausea, abdominal pain, and diarrhea. His workup was consistent with reflux as well as severe lactase enzyme deficiency. His blood pressure was elevated (Tr. 725).

On February 9 and March 7 and 10, 2010, the plaintiff was seen for the incision and drainage of an abscess on his buttock (Tr. 521, 530, 635).  On March 31, 2010, the plaintiff was still experiencing diarrhea.  He was unable to tolerate food due to nausea.  An esophagogastroduodenoscopy ('EGD") demonstrated moderate to severe gastritis and avodenitis.  He was also found to be lactose intolerant (Tr. 262).  On June 4, 2010, the plaintiff reported that he was fatigued, had blurry vision, abdominal pain, and headaches (Tr. 260).  On June 11, 2010, the plaintiff reported depression at a visit to Barnwell Family Medicine.  He was noted to be anxious and had a mild depressed affect.  He was prescribed Lexapro and Alprazolam (Tr. 310).  On October 19, 2010, the plaintiff was seen for diabetes, asthma, vitamin D deficiency, and increased lipids (Tr. 254).

On November 2, 2010, the plaintiff's lipid profile was elevated.  His vitamin D dosage was increased.  His glucose level was 299.  The plaintiff was transitioned to Adult Endocrinology with Dr. Rizvi and referred to the Columbia Eye Clinic (Tr. 246).  He was treated at the Aiken Regional Medical Center on November 4, 2010, for back and abdominal pain (Tr. 457).

On December 20, 2010, the plaintiff underwent a consultative psychological examination with Robert Phillips, Ph.D. (Tr. 322-25).  The plaintiff complained of depression close to four days a week (Tr. 322).  He reported taking an anti-depressant, which helped some (*Id.*).  Dr. Phillips noted that the plaintiff's daily activities included going on the internet at school or at home and watching television.  Dr. Phillips noted that the plaintiff was able to bathe, dress, and groom himself, brush his teeth, transfer himself, walk, and climb stairs.  The plaintiff reported that he could drive, use the phone, shop, cook, and do light housework and laundry.  He reported that he could manage his medications and finances with help.  Dr. Phillips reported that the plaintiff was oriented to time, place, and person (Tr. 323).  The plaintiff demonstrated no pain behavior or psychomotor agitation during the examination.  His long-term memory appeared to be fair, and he had limited abstract

9

thinking ability. His logical thinking was intact and showed no signs of paranoia, forced speech, or hallucinations. The plaintiff's vocabulary was younger than his age, and his thought content was immature. Dr. Phillips reported that the plaintiff's attention span appeared normal and estimated that his IQ was in the low average range. Dr. Phillips wrote that, overall, the plaintiff appeared to be under a lot of stress, unable to manage his emotions, and was emotionally reacting to his physical problems (*Id.*). Dr. Phillips administered the Folstein Mini-Mental State Exam, on which the plaintiff scored a 26/30, placing him in the normal range (Tr. 323).[3] The plaintiff was able to correctly name the season, year, month, and day, but was unaware of the date. He was unable to complete "serial sevens" and missed four calculations. He was unable to spell "world" backwards (*Id.*). He was able to repeat all of the words spoken to him without difficulty and recalled two of the words after five minutes (Tr. 324). The plaintiff was able to follow a simple direction and read and complete a simple written task. He was able to write a simple sentence, but was unable to copy a simple geometric shape on paper. Dr. Phillips opined that the plaintiff's mental awareness appeared to be good (*Id.*).

Dr. Phillips concluded that the plaintiff experienced moderate depression with some anxiety. He wrote that the plaintiff demonstrated some cognitive interference with his focus and attention. Dr. Phillips also wrote that the plaintiff "clearly demonstrated the ability to maintain almost all of his basic ADLs [activities of daily living]." He wrote that the plaintiff was able to interact appropriately with him but appeared lethargic and somewhat depressed. Dr. Phillips opined that based on his educational and work history and his functional level, the plaintiff appeared "somewhat limited" in his ability to perform routine

---

[3] The Folstein Mini-Mental Stat[e] Examination is a test commonly used to grade a patient's cognitive state." *Martel v. Soc. §. Admin. Comm'r*, 2013 DNH 157, 2013 WL 6068241, at *3 n.5 (D.N.H. Nov. 18, 2013)(citing Marshal F. Folstein et al., *"Mini-Mental State:" A Practical Method for Grading the Cognitive State of Patients for the Clinician*, J. Psychiatric Res., Nov. 1975, at 189-98). "The mean score for 'normal' individuals is 27.6." *Id*.

work in a normal work or school setting due to his lethargy and depressed mood.  He opined that the plaintiff could understand and follow most directions and could avoid most dangerous situations.  He indicated that the plaintiff would likely need help managing finances (*Id.*).  Dr. Phillips diagnosed the plaintiff with depressive disorder, not otherwise specified, and assigned him a Global Assessment of Functioning ("GAF") score of 56 (Tr. 325).[4]

On January 19, 2011, the plaintiff was seen for nausea and vomiting.  He had lost 22 pounds in the past year (Tr. 343).  On January 24, 2011, a duodenum biopsy showed mild chronic inflammation and an acute hemorrhage.  A gastric biopsy revealed chronic inflammation and edema.  An upper EGD showed a gastric polyp that was removed, antral gastritis, and duodenitis.  The plaintiff was started on Prilosec (Tr. 345-47).  On January 27, 2011, the plaintiff went to the emergency room with body aches, epigastric pain, nausea, weakness, and depression (Tr. 387).  On February 4, 2011, the plaintiff was prescribed Phenergan, Lactaid, Zocor and Prilosec (Tr. 342)

On March 2, 2011, the plaintiff was seen at Aiken Regional Medical Center for lower abdominal pain (Tr. 457).  On March 10, 2011, the plaintiff saw Dr. Amarnath for follow up of diarrhea with a history of lactose intolerance (Tr. 397).  The plaintiff reported that his diarrhea had essentially resolved since his last visit in August 2010, but had started back a few months ago.  He complained of daily nausea, reflux, and six-to-seven episodes of diarrhea.  He reported that he often did not eat due to nausea and that his primary beverage was juice or fruit punch.  The plaintiff reported that his diabetes was poorly controlled, and the clinician noted that his dietary habits were "quite poor."  The clinician

---

[4] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

also noted that the plaintiff was not taking his prescribed Lactaid tablets on a regular basis. Dr. Amarnath questioned whether or not the plaintiff might have diabetic gastroenteropathy and possible infectious enteritis of irritable bowel syndrome. His issues might also be dietary or due to lactose intolerance. The plaintiff was prescribed Carafate for his reflux, and a follow up visit was scheduled for three weeks out (Tr. 397).

On March 27, 2011, the plaintiff presented to the Barnwell County Hospital emergency room complaining of moderate-severe abdominal pain with nausea, loss of appetite, and diarrhea (Tr. 382, 599). He was diagnosed with gastritis and gastroesophageal reflux disease ("GERD") (Tr. 383, 602). The clinician noted that he had uncontrolled diabetes and instructed him to follow his diabetic diet strictly, with no Pop Tarts or McDonald's, and to keep a record of fasting blood sugar for one week (Tr. 604). He was prescribed Phenergan, Prilosec, and Mylanta (*Id.*). On May 9, 2011, he was treated for another abcess at the emergency room (Tr. 367-68).

On May 4, 2011, the plaintiff was seen for another abcess on his buttock (470-74). On June 15, 2011, the plaintiff was treated after a motor vehicle accident when he reported neck and back pain (Tr. 478-80). X-rays of his cervical spine were negative (Tr. 440-48).

The plaintiff returned to PPGN on July 19, 2011, after a four-month absence (Tr. 736). The clinician noted that the plaintiff had not shown up for two appointments on March 31 and June 23, 2011. The plaintiff complained that he had constant nausea and that he vomited between every other week and one-to-two times per week. He also complained of daily abdominal pain and reported having at least three runny bowel movements per day. He reported that he was not taking his Lactaid tablets. The clinician noted that the plaintiff's colon biopsies were normal, but his stomach biopsy showed mild chronic gastritis, and his esophageal biopsy was consistent with reflux. She wrote that his diarrhea and nausea could be due in part to his lactose intolerance or possible reflux. The

clinician also noted that the plaintiff had poor compliance with diabetes management, as indicated by his last serum glucose and hemoglobin readings (Tr. 736).

On August 16, 2011, the plaintiff reported that he had eliminated all dairy products from his diet and that he rarely had abdominal pain (Tr. 737). He reported that his medication had improved his abdominal pain 25-50%. He endorsed having three-to-four bowel movements a day and vomiting one-to-two times a month. He complained of constant nausea. The clinician reinforced the plaintiff's GERD diet restrictions and scheduled an abdominal ultrasound for the next day, which the plaintiff subsequently cancelled (*Id.*).

On August 24, 2011, a neurology study showed evidence of mild peripheral sensorimotor neuropathy, consistent with diabetic peripheral neuropathy (Tr. 739).

A February 28, 2012, a colonoscopy showed mild chronic inflammation in the plaintiff's rectum, and he was diagnosed with colitis and non-bleeding mild hemorrhoids (Tr. 561-62).

X-rays of the plaintiff's abdomen taken on March 5, 2012, showed no acute abdominal abnormality (Tr. 436). A March 22, 2012, computerized tomography ("CT") scan showed no definite inflammatory process with normal bowel gas patterns (Tr. 437). On April 25, 2012, the plaintiff was seen for depression and insomnia (Tr. 754-55).

### State Agency Residual Functional Capacity Assessments

On January 6, 2011, Samuel Goots, Ph.D., a state agency psychologist, reviewed the available evidence of record and completed a Psychiatric Review Technique form ("PRTF") (Tr. 327-39). He opined that the plaintiff's impairments did not meet or equal any listed mental impairments (*Id.*). He further opined that the plaintiff had no restriction in activities of daily living, mild difficulties in social functioning and concentration, persistence, or pace, and no episodes of decompensation (Tr. 337).

On July 25, 2011, upon review of an expanded record, a second state agency psychologist, Manhal Wieland, Ph.D., completed another PRTF (Tr. 398-410). He agreed that the plaintiff's impairments did not meet or equal any listed impairments (*Id.*). He opined that the plaintiff had mild restrictions in activities of daily living and social functioning, moderate difficulties in concentration, persistence, or pace, and no episodes of decompensation (Tr. 408). Dr. Wieland also completed a Mental Residual Functional Capacity ("RFC") Assessment, in which he opined that the plaintiff was able to: understand and remember short simple instructions; perform simple unskilled tasks; get along with co-workers; and perform the mental demands of simple unskilled work activities (Tr. 414).

### Administrative Hearing

At his November 2012 hearing, the plaintiff testified that he was unable to work due to nausea, headaches, and dizziness associated with his diabetes and blood sugar. He testified that his medications helped his nausea "sometimes," but that he still vomited twice a day. He indicated that he tried to follow a diabetic diet, but that he did not eat much due to his nausea (Tr. 767-69). He testified that he took his insulin as prescribed, but acknowledged that he would miss a dose or two when he was not at home. He denied that he had taken pain medications or received shots for his headaches (Tr. 769-70). The plaintiff testified that his dizziness prevented him from standing for long periods and also interfered with his ability to walk or bend down to pick things up (Tr. 767, 770-71). He denied having problems sitting, but also denied being able to perform a sedentary job on a full-time basis due to his nausea (Tr. 771). He testified that he experienced daily episodes of diarrhea, which were exacerbated by eating or drinking and prevented him from going outside (Tr. 780-81). He testified that he experienced numbness and coldness in his hands three-to-four times a week (Tr. 783).

The plaintiff testified that he lived alone in an apartment, though his sister would stay over five days a week to help him out. He testified that he had a checking

14

account and managed food stamps and an EBT card (Tr. 773, 774). He reported that he did not do his own grocery shopping because he could not stand in line due to his nausea (*Id.*). He testified that he had his driver's license and that he drove a car occasionally, but not often due to his blurred vision and nausea (Tr. 774-75). The plaintiff testified that he was able to read the newspaper. He testified that he spent most of his time lying in bed watching television (Tr. 777, 780). He reported that he no longer did chores, prepared his own meals, or used the computer due to his worsening symptoms. He testified that he isolated himself from others (Tr. 778-80).

The plaintiff reported that he spent over half of the day lying down as a result of feeling nauseous. His doctors were still researching what might be causing the nausea, and the attorney stated that there were a number of diagnoses in the file, such as colitis, gastritis, and diabetes gastroparesis. His doctors told him he may just have to live with the nausea if they could not figure out what was going on (Tr. 780-81). The plaintiff testified that he would eventually like to become a CNA nurse or do phlebotomy work. He was not trying to get the qualifications to do that at the time of the hearing, but it was something he would consider if his symptoms improved. The plaintiff stated that he could not do sedentary work because of his nausea (Tr. 784).

The plaintiff stated that the medications helped a little bit, but not much. He still felt like he needed to lie down. He checked his blood sugar regularly, and it was always over 200. The plaintiff had spoken with his doctors and they had tried to get it under better control, but it had not helped. The attorney noted an electromyography ("EMG") documenting peripheral neuropathy. The plaintiff's depression caused crying spells. He reported that he would have to call someone to talk to because he would cry without stopping and start thinking about suicide (Tr. 782-83).

The ALJ proposed the following hypothetical to the vocational expert:

15

> Assume an individual of the same age, education, and work history as the claimant. The individual has the ability to perform the exertional and nonexertional requirements of medium work, except an avoidance of concentrated exposure to fumes, odors, dusts, and gases. The individual could perform simple tasks, but no detailed or complex tasks. The individual could work satisfactorily with coworkers and supervisors, but should only have superficial contact with the public. There should be no counter work, customer service work, or sales. The individual would do best in a work environment that did not require high production standards, such as an assembly line.

(Tr. 786).

The vocational expert stated that the individual could perform work as a laundry laborer, DOT of 361.687-018, unskilled, medium, with 200 jobs in the state and 1,500 jobs nationally; a kitchen helper, DOT of 318.687-010, unskilled, medium, with 4,000 jobs in the state and 100,000 jobs nationally, or a car wash attendant, DOT of 915.667-010, unskilled, light, with 2,000 jobs regionally and 140,000 jobs nationally (Tr. 786-87).

The ALJ asked if the hypothetical individual required the ability to lie down for at least two hours in a workday, would there be work. The vocational expert answered that there would be no work. The attorney asked if the individual were limited in terms of standing and sitting, sitting half a day and standing and walking two hours, and would have two to three days of missed work per month, would those restrictions allow for full-time competitive work activity. The vocational expert answered that those restrictions would preclude employment. In terms of an absentee issue, in a simple entry-level type work, the vocational expert stated that an employee could miss up to two days per month (Tr. 787-88).

## **ANALYSIS**

The plaintiff argues the ALJ erred by: (1) failing to properly evaluate whether he met Listing 12.05(C), (2) failing to explain the RFC findings; and (3) failing to properly evaluate his credibility.

16

***Listing 12.05(C)***

The plaintiff first argues that the ALJ failed to properly evaluate whether he met Listing 12.05(C).  Listing 12.05 provides in pertinent part:

> *Intellectual Disability*: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ***
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> ***

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.

As set forth above, to meet the diagnostic description or "capsule definition" of intellectual disability, an individual must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [i.e., onset before age 22]." *Id*.  This has been described by the Fourth Circuit Court of Appeals as "Prong 1" of Listing 12.05(C). *See Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012). " '[A]daptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age. . . ."  Social Security Program Operations Manual System ("POMS") § DI 24515.056(D)(2), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056.  Next, the Listing requires a claimant to satisfy one of four additional requirements, categorized in the Listing as Requirements A–D. Here, as in *Hancock*, Requirement C is at issue, requiring an IQ score of 60–70, which the Fourth Circuit describes as "Prong 2," as well as a "physical or mental impairment imposing an additional

and significant work-related limitation of function," identified as "Prong 3." *Hancock*, 667 F.3d at 473.

The ALJ found that the plaintiff did not meet the "paragraph C" criteria because he did "not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function" (Tr. 21). The ALJ acknowledged that the plaintiff received a full-scale IQ score of 66 on the WISC-III in August 2000, when he was seven years old (Tr. 21; *see* Tr. 658-59). However, the ALJ discounted this score after determining that it was inconsistent with other evidence of record, including both contemporaneous and subsequent intelligence assessments (Tr. 21-22). "This circuit permits an ALJ to weigh conflicting IQ test results . . . ." *Hancock*, 667 F.3d at 474 (citing *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987)).

As the ALJ noted, in May 2000, the plaintiff scored in the low-average range of cognitive functioning, as measured by his composite score of 84 on the Stanford-Binet IV (Tr. 21-22, 231-35). The Stanford-Binet IV is an acceptable measure of IQ testing for purposes of the Commissioner's Listings. *See, e.g., Siler v. Astrue*, No. 7:08CV00197, 2009 WL 1759558, at *4, 8, 13 (W.D. Va. June 19, 2009); POMS DI 24515.055 ("The IQ requirements denoting a disabling impairment under the Listing of Impairments are meant for application in conjunction with tests of general intelligence having IQ means of approximately 100 and standard deviations of approximately 15 in the general population at large (e.g., the Wechsler series… and the revised Stanford-Binet scales). Note: The Stanford-Binet IV is preferred over the earlier LM edition because of the updated and enlarged normative sample.").

As noted by the Commissioner, Drs. Wieland and Goots, the reviewing State agency psychologists whose PRTFs the ALJ gave great weight (Tr. 26), both cited the plaintiff's Stanford-Binet IV IQ score of 84 and concluded that the plaintiff did not satisfy any

18

of the prongs of Listing 12.05, including the requisite IQ score (Tr. 331, 339, 402, 410). *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (holding that opinions of State agency physicians that claimant did not meet or equal a listing constituted substantial evidence supporting the ALJ's finding).

The ALJ also relied on the plaintiff's December 2010 consultative psychological examination when he was eighteen years old (Tr. 22; *see* Tr. 322-25). As the ALJ noted, Dr. Phillips estimated the plaintiff's IQ to be in the low-average range, which is consistent with his performance on the Stanford-Binet IV test in May 2000 (Tr. 22; *see* Tr. 323). Moreover, as the ALJ also recounted, Dr. Phillips further found that the plaintiff "clearly demonstrated the ability to maintain almost all of his basic [activities of daily living]" (Tr. 26; *see* Tr. 323-24). Although Dr. Phillips did not perform testing to obtain an IQ score, the ALJ was still entitled to rely on his medical report as evidence discrediting the August 2000 WISC-III IQ score. *See Hancock*, 667 F.3d at 475 ("Here, in discrediting the IQ scores, the ALJ relied on the examiner's omission as well as the results' inconsistency with both the claimant's actual functioning and with the notes of treating psychiatrists. These facts bring this case in line with the above-cited cases from the Third, Fifth, Eighth, Tenth, and Eleventh Circuits in which an ALJ discredited IQ scores based on other evidence contradicting them.").

In a footnote, the plaintiff argues that the ALJ's finding regarding his IQ was precluded under *Lively v. Sec'y of Health & Human Servs.*, 174 F.3d 473 (4th Cir. 1987) and *Albright v. Comm'r of Soc. Sec. Admin*., 174 F.3d 473 (4th Cir. 1999), due to a favorable decision he received from another ALJ in 2010 finding that his disability continued under the childhood listings (pl. brief at p. 20 n.1). The plaintiff asserts that the favorable 2010 decision "specifically found that King's IQ met the requirements of Listing 112.05(D) which equates to the adult Listing 12.05(C)."   However, as argued by the Commissioner, the favorable 2010 decision was based on a determination that the plaintiff's impairments

19

functionally equaled the requirements of Listing 112.02, which is the childhood listing for Organic Mental Disorders (*see* doc. 25-1).[5]   *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.02.   There was no finding that he met Listing 112.05. In fact, the ALJ in the 2010 decision cited intelligence testing from both 2004, showing IQ scores of 85, 84, and 83, and 2006, showing a full scale IQ score of 105 (doc. 25-1 at p. 5).   Accordingly, the favorable 2010 decision provides no basis for remand.

Based upon the foregoing, the undersigned finds that the ALJ did not err in discounting the plaintiff's August 2000 IQ score, and her step three findings are based upon substantial evidence.

### Residual Functional Capacity

The plaintiff next argues that the ALJ erred by failing to include in the RFC finding limitations associated with his gastritis, GERD, and lactose intolerance, which the ALJ credited as severe impairments at step two (pl. brief at pp. 26-28).  As noted by the Commissioner, the fact that the ALJ found that these impairments passed the *de minimis* test at step two did not require her to find that they merited inclusion of additional functional limitations in the RFC finding. *See, e.g., Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) ("The ALJ's finding [at step two] that the limitation was more than minimal, however, was not inherently inconsistent with his finding that the limitation has 'little effect' on the claimant's ability to perform basic work[-]related activities."); *Chappell v. Colvin*, No. 1:10CV384, 2014 WL 509150, at *4 (M.D.N.C. Feb. 7, 2014) ("The determination of a 'severe' impairment at step two of the sequential evaluation process is a *de minimis* test, designed to weed out unmeritorious claims. . . .  A finding of *de minimis* limitations is not proof that the same limitations have the greater and specific nature

---

[5]This 2010 decision is not part of the record and was submitted by the Commissioner in response to the plaintiff's argument (*see* doc. 25-1).

required to gain their inclusion in an RFC assessment at step four.") (quoting *Hughes v. Astrue*, No. 1:09CV459, 2011 WL 4459097, at *10 (W.D.N.C. Sept. 26, 2011)).

The ALJ explained that she credited that these conditions - and others - caused the plaintiff some pain and accordingly reduced his RFC to a limited range of medium level work (Tr. 27). However, as the ALJ further explained, treatment records documented that the plaintiff's symptoms were caused in part by his noncompliance with diabetes and lactose intolerance treatment protocols and that his conditions improved when he adhered to such protocols (Tr. 25-27). *See, e.g., Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.") (citation omitted). The ALJ noted that although the plaintiff complained of nausea and diarrhea six times a day in March 2011, treatment notes showed that he did not take his prescribed Lactaid tablets regularly (Tr. 22; *see* Tr. 397). Similarly, the ALJ recounted that when the plaintiff complained of abdominal pain in March 2007, he was instructed not to eat Pop Tarts and McDonald's and was prescribed Prilosec and Mylanta (Tr. 23; *see* Tr. 604). The ALJ further noted that despite the plaintiff's complaints of abdominal pain, he did not show up for gastroenterology appointments in March and June 2011 (Tr. 23; *see* Tr. 736). The ALJ also found it significant that the plaintiff reported in August 2011 that when he complied with his diet and refrained from eating dairy products, he rarely had abdominal pain, and his pain improved 25-50% with medications (Tr. 23, 25-26; *see* Tr. 737). As argued by the Commissioner, while the plaintiff reported having three-to-four bowel movements per day and vomiting once or twice a month after eating, he failed to establish that such symptoms required additional limitations on his work-related functioning. As the ALJ further noted, objective findings were relatively benign, including a March 2012 x-ray that showed no acute abdominal abnormality and a March 2012 abdominal CT scan that showed no definitive inflammatory process or abnormal bowel gas pattern (Tr. 23; *see* Tr. 436-37).

The plaintiff also argues that the ALJ failed to consider the impairments she considered to be non-severe, back and neck pain and headaches, in combination with the plaintiff's severe impairments (pl. brief at p. 28). When, as here, a claimant has more than one impairment, the ALJ must consider the severe and non-severe impairments in combination in determining the plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)). The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. §§ 404.1523, 416.923.

The ALJ's decision contains an adequate explanation of her consideration of the combined effects of the plaintiff's impairments (Tr. 19-20). *See Brown v. Astrue*, No. 0:10-cv-01584-RBH, 2012 WL 3716792, at *6-7 (D.S.C. Aug. 28, 2012) (holding that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments.") (citing *Walker*, 889 F.2d at 50). Here, after discussing the plaintiff's non-severe impairments of back and neck pain and headaches, the ALJ explained that "the record does not indicate that any limitations have been imposed on the claimant due to any of these impairments, either individually, or in combination" (Tr. 19-20). As argued by the Commissioner, the fact that the ALJ included this statement in the section of her decision discussing the step-two finding rather than in the RFC discussion does not disprove her consideration of the combined functional effects of the plaintiff's impairments. Moreover, the plaintiff has failed

22

to explain how further explanation by the ALJ would have resulted in different findings more favorable to him. *See Robinson v. Astrue*, No. 10-cv-185-DCN-BHH, 2011 WL 4368416, at *5-6 (D.S.C. Feb. 18, 2011) (noting that "it is the plaintiff's responsibility to explain how the ALJ's alleged failure to be more complete in explanation [of combined effects], than is present here, somehow harmed the conclusion drawn."), adopted by 2011 WL 4368396 (D.S.C. Sept. 19, 2011). *See also Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

In making the RFC finding, the ALJ expressly weighed the objective medical findings, medical opinion evidence (including the opinions of the State agency psychological consultants, which were given great weight), course of treatment, and the plaintiff's own statements regarding the severity and limiting effects of his symptoms (Tr. 22-27). Based upon the foregoing, the undersigned finds that the ALJ's RFC analysis is based upon substantial evidence and without legal error.

**Credibility**

Lastly, the plaintiff argues that the ALJ "failed to properly explain why she found [him] less than credible" (pl. brief at pp. 29-33). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

23

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about

the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

> (7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ found that while the plaintiff's medically determinable impairments could cause the alleged symptoms, his allegations concerning the severity and limiting effects of his impairments were not "entirely credible" (Tr. 25, 27). Specifically, as discussed above, the ALJ discounted the plaintiff's allegations concerning the severity and limiting effects of his abdominal/digestive impairments based on medical records showing that he was not always compliant with treatment and that, when he was compliant, his conditions improved (Tr. 22-23, 25-26, 27).   The plaintiff now appears to argue that he did not follow prescribed treatment due to his inability to afford it (pl. brief at pp. 30-31).  As the Fourth Circuit stated in *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir.1984), "[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him." It is well settled that a claimant for Social Security benefits should not be "penalized for failing to seek treatment [he] cannot afford." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986).  SSR 96-7P expressly addresses the situation where a claimant asserts that he has not pursued medical treatment because of a lack of financial resources. *See* SSR 96-7P, 1996 WL 374186.  In such a situation, the fact finder is admonished from drawing "any inferences about an individual's symptoms and their functional effects" from a failure to pursue medical treatment "without first considering any explanations that the individual may provide . . . ." *Id.* at *7.  However, the plaintiff points to no testimony or other evidence in the record before the ALJ that he did not seek additional treatment due to his financial condition. *See Miller v. Colvin*, C.A. No. 4:13-cv-914-DCN, 2014 WL 2112696, at *6 (D.S.C. May 20, 2014) (finding ALJ did not err in considering the plaintiff's lack of treatment in assessing her credibility because there was

26

no testimony or other evidence that she could not afford treatment). Thus, the ALJ did not err in considering the plaintiff's failure to comply with prescribed treatment.

The plaintiff further argues that to the extent the ALJ used his noncompliance as a basis "to dismiss [his] credibility," "the ALJ [was] required to make certain findings" (pl. brief at p. 30) (citing 20 C.F.R. § 404.1530(b)). However, as argued by the Commissioner, although the ALJ considered the plaintiff's noncompliance with treatment in assessing the credibility of his subjective allegations, the ALJ did not deny his claim under 20 C.F.R. § 404.1530, as the plaintiff alleges. Section 404.1530 would have been implicated only if the ALJ had found that the plaintiff had an otherwise disabling impairment but that a finding of disability was nevertheless precluded due to the plaintiff's failure to follow prescribed treatment. *See* SSR 82-59, 1982 WL 31384, at *1 ("An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability."). Here, the ALJ made no such finding of an otherwise disabling impairment. Accordingly, this allegation of error is without merit.

The plaintiff also argues that the ALJ erred by considering his demeanor at the hearing (pl. brief at pp. 31-32). The ALJ listed the plaintiff's presentation at the hearing as one of several pieces of evidence indicating that he could meet the demands of simple work (Tr. 26). The ALJ also listed intelligence testing, consultative examination notes, course of treatment, and activities of daily living in the context of the plaintiff's ability to perform simple work (*Id*.). Personal observations may be considered as one of several factors in evaluating a claimant's credibility. *See* SSR 96-7p, 1996 WL 374186, at *8 ("In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject the individual's complaints solely on the basis of such personal observations, but should consider any personal observations in the overall evaluation of the

credibility of the individual's statements."). Moreover, the hearing transcript reflects that the plaintiff understood the questions asked and answered them appropriately, which was relevant to the plaintiff's ability to perform simple work, which requires, inter alia, the ability to understand, carry out, and remember simple instructions and respond appropriately to others (Tr. 766-85). *See* SSR 85-15, 1985 WL 56857, at *4.

Moreover, contrary to the plaintiff's assertion otherwise (pl. brief at p. 32), the ALJ reasonably determined that he did not appear particularly motivated to work (Tr. 26). The plaintiff testified that he had never worked and had not attended vocational rehabilitation in the last couple of years (Tr. 26; *see* Tr. 777). *See* SSR 96-7p, 1996 WL 374186, at *5 (listing "prior work record and efforts to work" as appropriate considerations for the credibility determination). Similarly, the ALJ reasonably questioned the plaintiff's motivation for school, considering the fact that he frequently missed sessions of special instruction in which his teachers came to his house (Tr. 26; *see* Tr. 186, 776-77). The ALJ also cited to school records in which the plaintiff acknowledged having not studied enough and in which his teacher noted that he "chose[]" not to work on his homework assignments (Tr. 26; *see* Tr. 150, 188). Importantly, however, the ALJ's opinion of the plaintiff's motivation to work was not the only factor she considered in evaluating his credibility. As discussed above, she also considered the objective medical findings, medical opinion evidence, course of treatment, and reported activities of daily living (Tr. 22-27).

Based upon the foregoing, the undersigned finds that the ALJ's credibility determination is based on substantial evidence of record and without legal error.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald<br>
United States Magistrate Judge

October 15, 2014
Greenville, South Carolina